1
2
3
4
5
6
7
8                            NOT FOR CITATION

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12   ANTWION E. THOMPSON,              )    No. C 05-1264 JF (PR)
                                       )
13                    Petitioner,      )    ORDER DENYING PETITION FOR
         vs.                           )    A WRIT OF HABEAS CORPUS;
14                                     )    DENYING PETITIONER'S
                                       )    MOTIONS
15                                     )
     D.L. RUNNEL, Warden, et. al.,     )
16                                     )
                      Respondents.     )
17   _____ )    (Docket Nos. 41, 42)

18

19        Petitioner, a California prisoner proceeding pro se, seeks a writ of habeas corpus pursuant

20   to 28 U.S.C. § 2254.  The Court ordered Respondent to show cause why the petition should not

21   be granted.  Respondent has filed an answer and a supporting memorandum of points and

22   authorities addressing the merits of the petition.  Although given the opportunity to do so,

23   Petitioner did not file a traverse.  However, Petitioner has filed a motion asserting ineffective

24   assistance of counsel and a motion for an evidentiary hearing.  Having reviewed the papers and

25   the underlying record, the Court concludes that Petitioner is not entitled to habeas corpus relief

26   and will deny the petition.  Petitioner's motions also will be denied.

27   ///

28   ///

**PROCEDURAL BACKGROUND**

A Contra Costa Superior Court jury convicted Petitioner of first degree murder and mayhem pursuant to California Penal Code § 187 and § 203, respectively, and found Petitioner guilty of using a deadly weapon within the meaning of Penal Code § 12022(b)(1). On August 5, 2002, Petitioner was sentenced to a term of twenty-six years-to-life in prison. The trial court stayed imposition of the four-year term on the mayhem count.

Petitioner appealed the judgment. The state appellate court affirmed the judgment on February 3, 2004. The state supreme court denied a petition for review on April 21, 2004. Petitioner filed the instant habeas corpus petition on March 29, 2005.

**FACTUAL BACKGROUND**[1]

Petitioner does not dispute the following facts, which are taken from the unpublished opinion of the California Court of Appeal:

> In June 1998, appellant Thompson was 18 years old and lived with his father, Edward Thompson, in Bay Point; the victim, Arie Bivins, was 17 years old and lived with her parents in Pittsburg. Thompson and Bivins were boyfriend and girlfriend. They began dating in 1997. Their relationship deteriorated by Spring 1998; Bivins wanted to break up with Thompson, who was jealous and controlling. On June 21, 1998, Thompson eavesdropped as Bivins told a friend that she was interested in another guy.
>
> At approximately 1:30 p.m. on June 22, 1998, Edward Thompson saw appellant Thompson and Bivins talking in Bivins' car outside Thompson's home. Appellant Thompson subsequently came inside and then left again around 2:00 p.m. without saying where he was going. At about 4:00 p.m., Thompson returned home and convinced his father to drive him to Bivins' house, explaining that he was concerned about Bivins because he had been unable to reach her by telephone. When appellant and his father arrived at Bivins' house, appellant approached the front door and his father waited in the car. Edward Thompson saw appellant knock, open the front door, and then become wildly upset. Edward Thompson approached and saw Bivins on the floor by the front door with a hole in her chest and cuts on her cheek and neck. He went to a neighbor's house and called 911. Paramedics subsequently confirmed that Bivins was dead. The cause of death was a stab would to the chest.
>
> When Pittsburg police officer Carl Webb arrived at Bivins' house at 4:22 p.m. on June 22, 1998, he observed Thompson in the driveway jumping up and down, running around, and flailing his arms. Officer Eric Solzman arrived at the scene and Webb told him to "hang on" to Thompson because they needed to talk to him. Solzman approached Thompson, who told Solzman that he did not feel well. Solzman asked Thompson whether he wanted to lie in the back of Solzman's patrol

---

[1] Relevant facts are taken from the unpublished opinion of the California Court of Appeal. See People v. Thompson, A099879 (February 3, 2004); Respondent's Exhibit 6 at 2-4.

car, because it was a warm day and the car was air conditioned, and Thompson agreed. Thompson never asked to get out of the patrol car, and Solzman never told Thompson he had to stay. Although Thompson was not free to leave in Solzman's mind, he never conveyed that to Thompson.

Pittsburg police homicide inspector John Conaty arrived at the scene at about 4:45 p.m. Thompson was in Solzman's car and appeared to be sleeping. Conaty talked to Edward Thompson, who told him about driving his son to the house and discovering the body. Conaty and his partner, Inspector Giacomelli, then approached appellant Thompson, who appeared to be waking up when they opened the door. Thompson said he was "okay" and stepped out of the car to talk to the inspectors. Conaty asked Thompson if he would be willing to go to the police station to talk about the circumstances of finding Bivins' body. Thompson said he just wanted to go home and sleep. Thompson agreed to go to the station after Conaty explained that his assistance could be critical to the investigation.

Solzman took Thompson to the police station at about 5:30 p.m. He never handcuffed or pat-searched Thompson. He put Thompson in the station's break room, which had a couch and a television. He asked Thompson if he needed food or water. He told Thompson to relax and that he could watch television; Thompson laid down on the couch and started to watch television. Solzman told Thompson that he would be outside if Thompson needed anything or had any questions. Solzman sat at a desk in the hallway to write a report; he could see Thompson in the break room through the open door. Thompson was not handcuffed; he never asked to leave, never said he was cold, and never asked for food or water. Solzman never told him Thompson was not free to leave. Thompson slept most of the time until the inspectors arrived, about five and a half hours later.

Inspectors Conaty and Giacomelli approached Thompson in the station break room at about 11:00 or 11:30 p.m. Thompson said he was feeling "okay." Conaty apologized for keeping Thompson waiting and asked if they could talk to him down the hall; Thompson agreed. Thompson did not indicate that he wanted to leave, that he did not want to talk to them, or that he wanted to talk to his father. Thompson was not handcuffed, and both inspectors were wearing suits and did not have guns. The inspectors took Thompson to a small interview room with three chairs. The door was closed but not locked. When Thompson said that the room was cold, Conaty turned on the heater.

The questioning, which was videotaped, lasted about two hours. At the outset, Thompson complained of a headache. Inspector Conaty asked Thompson, "Do you feel like doing - can we do this now or would you rather do this another time? . . . You can go if you don't want to do it now." Thompson replied, "We can go through it." The inspectors then questioned Thompson for an extended period without providing Miranda warnings. Over the course of the questioning, Thompson admitted that he had been at Bivins's house immediately before he asked his father to take him there and that he had stabbed Bivins by accident during an argument when Bivins came at him while he was holding a knife. Subsequently, the inspectors informed Thompson of his Miranda rights. Thompson then repeated his earlier admissions.

At about 2:00 a.m., Thompson led the inspectors to locations where he had disposed of the knife and burned his clothes. Thompson also agreed to participate in a videotaped reenactment of Bivins's death. The reenactment commenced at about 12:47 p.m. on June 23, 1998.
Ex. 6 at 2-4.

1

2

3

4

5

6

7

8

9

10

          Before trial, Thompson moved to suppress his statements as involuntary in violation of the Fifth Amendment.  The trial court granted in part and denied in part the motion to suppress.  The court found that Thompson was not in custody while he was waiting in the break room and at the outset of the questioning by the inspectors. The questioning did, however, become custodial when it became more accusatory; in particular, at the point the inspectors lectured Thompson by analogy about taking responsibility for his actions.  Because Thompson should have been read his Miranda rights when the questioning became custodial, the trial court suppressed all of Thompson's statements after the "responsibility story," until the inspectors read Thompson his Miranda rights.  The trial court further found that, after the reading of his rights, Thompson validly impliedly waived his rights and made a range of incriminating statements.  Finally, the trial court found that Thompson's videotaped statements the next day were admissible, because the statements were given after additional Miranda warnings and waiver of his rights, and were not tainted by any of the previous night's events.

Ex. 6 at 5.

**LEGAL CLAIMS**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     Petitioner asserts the following claims for habeas relief:  (1) his initial incriminating statements were inadmissible because they were unlawfully obtained without Miranda advisements, and his subsequent statements after his Miranda waiver were inadmissible because they were tainted fruits of the earlier Miranda violation; (2) his incriminating statements were involuntary because they were the product of the police inspectors' implied promises of leniency, threats of punishment, and other coercive tactics and circumstances of the interrogation; (3) his initial incriminating statements were inadmissible because they were obtained unlawfully without Miranda advisements, and his subsequent statements after his Miranda waiver were inadmissible because his waiver was involuntary; and (4) his incriminating statements were inadmissible as they were the tainted fruit of an unlawful detention; because tricking and pressuring Petitioner into going to the police station and then requiring him to wait for five-and-a-half hours alone in a room constituted a detention, and the officer who detained Petitioner was not aware of Petitioner's search and seizure probation condition.

///

1

**DISCUSSION**

2

**A.    Standard of Review**

3

4

        Because the instant petition was filed after April 24, 1996, it is governed by the

5

Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes significant

6

restrictions on the scope of federal habeas corpus proceedings.  Under AEDPA, a federal court

7

may not grant habeas relief with respect to a state court proceeding unless the state court's

8

ruling was "contrary to, or an involved an unreasonable application of, clearly established

9

federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1),

10

or "was based on an unreasonable determination of the facts in light of the evidence presented in

11

12

the State court proceeding."  28 U.S.C. § 2254(d)(2).

13

        "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

14

court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

15

law or if the state court decides a case differently than [the] Court has on a set of materially

16

indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the

17

'unreasonable application clause,' a federal habeas court may grant the writ if the state court

18

19

identifies the correct governing legal principle from [the] Court's decisions but unreasonably

20

applies that principle to the facts of the prisoner's case."  Id.  "[A] federal habeas court may not

21

issue the writ simply because the court concludes in its independent judgment that the relevant

22

state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

23

that application must also be unreasonable."  Id. at 411.

24

25

        "[A] federal habeas court making the 'unreasonable application' inquiry should ask

26

whether the state court's application of clearly established federal law was 'objectively

27

unreasonable.'"  Id. at 409.  In examining whether the state court decision was objectively

28

1   unreasonable, the inquiry may require analysis of the state court's method as well as its result.

2   Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003).  The "objectively unreasonable"

3   standard does not equate to "clear error" because "[t]hese two standards . . . are not the same.

4   
5   The gloss of clear error fails to give proper deference to state courts by conflating error (even

6   clear error) with unreasonableness."  Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

7        A federal habeas court may grant the writ if it concludes that the state court's

8   adjudication of the claim "resulted in a decision that was based on an unreasonable

9   determination of the facts in light of the evidence presented in the State court proceeding."  28

10  U.S.C. § 2254(d)(2).  The court must presume correct any determination of a factual issue made

11  by a state court unless the Petitioner rebuts the presumption of correctness by clear and

12  convincing evidence.  28 U.S.C. § 2254(e)(1).

13  
14  **B.    Miranda Violation**

15  _____The Court addresses in turn three distinct phases of Petitioner's interaction with

16  Inspectors Conaty and Giacomelli at the police station: 1) the initial non-custodial interview,  2)

17  the voluntary pre-Miranda confrontation and 3) the post-Miranda interrogation.

18  
19  _____In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that certain

20  warnings must be given before a suspect's statement made during custodial interrogation can be

21  admitted in evidence.  Miranda and its progeny govern the admissibility of statements made

22  during custodial interrogation in both state and federal courts.  Dickerson v. United States, 530

23  U. S. 428, 443-45  (2000).  The requirements of Miranda are "clearly established" federal law

24  for purposes of federal habeas corpus review under 28 U.S.C. § 2254(d).  Juan H. v. Allen, 408

25  F.3d 1262, 1271 (9th Cir. 2005); Jackson v. Giurbino, 364 F.3d 1002, 1009 (9th Cir. 2004).

26  
27  
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Miranda requires that a person subjected to custodial interrogation be advised that he has

the right to remain silent, that statements made can be used against him, that he has the right to

counsel, and that he has the right to have counsel appointed.  These warnings must precede any

custodial interrogation, which occurs whenever law enforcement officers question a person after

taking that person into custody or otherwise significantly deprive a person of freedom of action.

Miranda v. Arizona, 384 U.S. at 444.

Miranda protections are triggered "only where there has been such a restriction on a

person's freedom as to render him 'in custody.'"  Stansbury v. California, 511 U.S. 318, 322

(1994) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).  "[I]n custody" means

"'formal arrest or restraint on freedom of movement' of the degree associated with a formal

arrest."  California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Oregon v. Mathiason, 429

U.S. at 495).  It requires that "a reasonable person would have felt that he or she was not at

liberty to terminate the interrogation and leave," as judged by the totality of the circumstances.

Thompson v. Keohane, 516 U.S. 99, 112 (1995).  The Ninth Circuit has identified several

factors relevant to the "in custody" determination:

> Pertinent areas of inquiry include [1] the language used by the officer to summon
> the individual, [2] the extent to which he or she is confronted with evidence of
> guilt, [3] the physical surroundings of the interrogation, [4] the duration of the
> detention and [5] the degree of pressure applied to detain the individual.  Based
> upon a review of all the pertinent facts, the court must determine whether a
> reasonable innocent person in such circumstances would conclude that after brief
> questioning he or she would not be free to leave.

United States v. Booth, 669 F.2d 1231, 1235 (9th Cir. 1981).  The determination of whether a

person is in custody for purposes of Miranda is a mixed question of law and fact.  Thompson,

516 U.S. at 107-10.

///

To determine the voluntariness of a confession, the court must consider the effect that the totality of the circumstances had upon the will of the defendant. Schneckloth v. Bustamonte, 412 U.S. 218, 226-27 (1973). "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." United States v. Leon-Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988) (citing Haynes v. Washington, 373 U.S. 503, 513-14 (1963)). A confession is voluntary when it is the product of a rational intellect and a free will. Thompson, 516 U.S. at 107-10. If a statement is the result of threats or violence or obtained by direct or implied promises, it is involuntary. United States v. Leon-Guerrero, 847 F.2d at 1366. However, not all statements made in response to a promise by law enforcement personnel are invalid. Id. "The promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances." Id. An officer's promise to tell the prosecutor about a suspect's cooperation even when accompanied by a promise to recommend leniency or the speculation that cooperation will have a positive effect does not render a subsequent statement involuntary. Id.; United States v. Willard, 919 F.2d 606, 608 (9th Cir. 1990), cert. denied, 502 U.S. 872 (1991).

Once properly advised of his or her rights, an accused may waive them voluntarily, knowingly and intelligently. Miranda, 384 U.S. at 475. A valid waiver of Miranda rights depends upon the totality of the circumstances, including the background, experience and conduct of the defendant. See United States v. Bernard S., 795 F.2d 749, 751 (9th Cir. 1986). The government must prove waiver by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168-69 (1986); Lego v. Twomey, 404 U.S. 477, 488-89 (1972); Terrovona v. Kincheloe, 912 F.2d 1176, 1180 (9th Cir. 1990). The waiver need not be express as long so

long as the totality of the circumstances indicates that the waiver was knowing and voluntary.

North Carolina v. Butler, 441 U.S. 369, 373 (1979); Juan H., 408 F.3d at 1271.

Habeas relief should be granted only if the admission of statements in violation of

Miranda "'had a substantial and injurious effect or influence in determining the jury's verdict.'"

Jackson, 364 F.3d at 1010 (quoting Calderon v. Coleman, 525 U.S. 141, 147 (1998)).

       1.    Custody

Petitioner maintains that the trial court and the state appellate court erroneously

determined that he was not in custody at the beginning of his "interrogation."  Petitioner

contends that *all* of his pre-advisement statements should be suppressed because he was in

custody from the beginning of questioning by Inspectors Conaty and Giacomelli.  Pet. at 6, 8.

Petitioner claims that although he agreed to go to the police station, he did so as the result of

police pressure.  Id. at 6.  Petitioner contends that, based on the totality of circumstances, he was

subjected to custodial interrogation because he did not consent to spend five-and-a-half hours

waiting in a break room, was not informed that he could leave the break room, was guarded the

entire time, and, when he finally was questioned, the police inspectors were confrontational,

accusatory, and made false assertions with respect to the evidence.  Id.  Petitioner does not cite

to any controlling Supreme Court authority suggesting that the state appellate court applied the

incorrect legal standard.

The state appellate court's conclusion that Petitioner was not in custody while he waited

in the break room or at the beginning of the questioning by police inspectors is reasonably

supported by testimony at the hearing on Petitioner's motion to suppress.  See Ex. 2 (Reporter's

Transcript ("RT")) at 161-165, 180-184 (inspector told Petitioner to relax and watch television

in the break room, door was left open, he slept most of the time and was not handcuffed or pat

searched); Ex. 9 at 4 (inspector told Petitioner that he wanted to talk about what happened, but it could be done at a later time and that Petitioner was free to leave if he did not want to talk to them).

Additionally, Petitioner voluntarily went to the police station after Inspector Conaty asked if he would be willing to speak about the circumstances of finding the body and explained that Petitioner's assistance could be critical to the investigation. Ex. 2 at 220-221. Petitioner was offered food and/or water, and Officer Solzman told Petitioner that if he needed anything or had any questions, Solzman would be outside the open door. The officer sat at a desk, writing a report during that time.

When the two inspectors arrived five-and-a-half hours later, they apologized for making Petitioner wait and asked to speak with him down the hall. Ex. 2 at 223-224, 227. Again, Petitioner was not handcuffed. When Petitioner stated that the room was cold, Inspector Conaty turned on the heater. Ex. 2 at 227. After Petitioner complained of having a headache, Inspector Conaty told him that they could talk another time and that Petitioner could leave if he did not want to talk. Ex. 9 at 3.

The language used by the inspectors to summon Petitioner to the police station weighs against a finding that Petitioner was in custody, since Petitioner was treated well by the police at the scene. Ex. 2 at 219-220. Petitioner was asked to go to the police station for questioning in the same manner as other witnesses to the crime, including his father. Ex. 2 at 220. The extent to which Petitioner was confronted with evidence of guilt weighs against a finding he was in custody because, until they suggested that they believed Petitioner was responsible, the police only asked Petitioner questions about what he did that morning. Ex. 9 at 15-21. When the inspectors did confront Petitioner with evidence of guilt, such as blood splatters on his shirt and

bloody fingerprints in the house, it was after Inspector Conaty's "responsibility" speech.  Ex. 9 at 53-55.  With respect to the physical surroundings of the interview, the record shows that Petitioner was in an unlocked interview room with three chairs, that Inspector Conaty turned up the heat when Petitioner complained of the cold, and that Petitioner was not handcuffed.  Ex. 2 at 227-228.

The duration of the events in question does weigh in favor of a finding that Petitioner was in custody, because approximately eight hours elapsed from the time he was taken to the police station in the evening until he was given his <u>Miranda</u> warnings at approximately 1:00 a.m. the next day.  However, during the time Petitioner was waiting to be questioned, he was in the station break room, where he slept and had access to television and food and water if he desired.  Ex. 2 at 161-167.  Moreover, Petitioner did not ask to leave or ask for food.  Ex. 2 at 183-184.  Finally, the degree of pressure applied to detain Petitioner weighs in favor of a finding that Petitioner was not in custody; the inspectors asked Petitioner if he was willing to come to the station, and no pressure was applied to keep Petitioner at the station after he arrived there.  Ex. 2 at 220.  In light of the highly deferential standard of the AEDPA, it was not an unreasonable application of the <u>Booth</u> factors to conclude that a reasonable person in Petitioner's circumstance would have felt at liberty to terminate the questioning and leave.

Accordingly, the appellate court's decision that Petitioner was not in custody until the questioning became accusatory was neither contrary to, or an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented.  <u>See</u> 28 U.S.C. § 2254 (d)(1), (2).  Additionally, because the trial court suppressed all of Petitioner's statements made from the inception of custodial interrogation until the <u>Miranda</u> warning was read by Inspector Conaty, Petitioner fails to show any prejudice.

2.    Voluntariness of Confession

Petitioner next claims that the police inspectors coerced him by "subjecting him to a lengthy interrogation and a prolonged waiting period beforehand, while depriving him of basic human needs." Pet. at 11. Petitioner alleges that the inspectors made implied promises of leniency and threats of punishment, and failed to advise him of his Miranda rights, all of which resulted in an involuntary confession. Id. at 12-13. Petitioner maintains that the trial court erred in denying his motion to suppress and the appellate court mistakenly rejected his Miranda claim. Id. at 10.

However, at trial the prosecution did not introduce any evidence of Petitioner's responses during questioning prior to the pre-Miranda confrontation. See Chavez v. Martinez, 538 U.S. 760, 767 (1994). The trial court concluded that in fact Petitioner was in custody when the questioning became accusatory. Accordingly, Petitioner's Miranda rights were not violated unless that interrogation in some manner affected his post-Miranda confession.

The state appellate court reviewed the videotapes of the interrogation and reenactment of the crime, the transcripts of the videotapes, and the testimony presented in connection with Petitioner's motion to suppress to determine whether Petitioner's statements were voluntary. Ex 6 at 8. In considering Petitioner's claim, the appellate court reasoned:

> Three general circumstances that are relevant to whether interrogators coerced a suspect's statements are "the length of detention," "the repeated prolonged nature of the questioning," and "physical punishment such as the deprivation of food or sleep." Thompson emphasizes that he was kept waiting in the break room for about five and a half hours, that he was questioned for almost two hours in the interview room, that he was not fed, and that he was cold and sleepy. However, Thompson came to the police station voluntarily, he refused Solzman's offer of food and water, he was able to and did sleep during his hours in the break room, he never asked for food or water, and Inspector Conaty turned on the heater in the interview room when Thompson said he was cold. Thompson was given an opportunity to postpone the questioning at the outset, and he chose to continue.

Thompson also contends that his "incommunicado" status at the police station contributed to the coercion. However, Thompson was not locked in an oppressive, windowless room. Instead, he waited in the break room with the door open, with access to a couch and television. He slept most of the time he was in the break room and never asked to leave or made any other requests. He did testify that he twice asked to speak to his father.  Inspector Conaty testified he did not.

. . .

Thompson contends that the inspectors' interrogation tactics rendered the unwarned statements involuntary.  He asserts that the inspectors' primary coercive tactic was implied promises of leniency if Thompson admitted to a role in Bivins's death.  A confession is involuntary where "a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess."  "Mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or a promise, does not, however, make a subsequent confession involuntary."

Thompson emphasizes the following statements, which he construes as promises of leniency: (1) the inspectors told Thompson it would be "understandable" if he had seen the victim's body before getting a ride from his father to the victim's home; (2) the inspectors analogized to parental discipline, telling Thompson that it is "hard [for a parent] to punish a child" who admits that he made a mistake and accepts responsibility for it, but if the child lies it is easier for the parent to "get angry" and "bring on the punishment;" (3) the inspectors asserted that "lovers' quarrels" were common and that events sometimes unintentionally "get out of hand;" (4) the inspectors suggested that Bivins "might have started this whole thing;" (5) the inspectors warned that people would believe Thompson purposely went to Bivins's house to harm her unless Thompson explained they had a fight and "somehow she got hurt;" (6) the inspectors told Thompson, "what makes or breaks this thing for how it comes out for you is to tell us what the circumstances were;" and (7) after Thompson admitted to accidentally stabbing Bivins in a fight, the inspectors stated that it was important that Thompson had dispelled their "presumption" that he had been angry and gone to Bivins's house to murder her.

. . .

The inspectors' comments in this case did not cross the line into coercion.  Instead, the general thrust of the inspectors' statements was that it would be better for Thompson if he told the truth and that his punishment would depend on the particular circumstances of the killing.  Importantly, the inspectors never promised, either expressly or impliedly, any specific benefits that would flow to Thompson if he confessed.

. . .

The inspectors' analogy here, suggesting that it is easier for a parent to "bring on the punishment" when a child lies, was an exhortation to tell the truth; it was not a promise or threat, particularly because, later in the interview, the inspectors told Thompson that they did not know what would happen to him because it was up to the District Attorney to decide what to do.

1
2
3
4
5
6
7
8
9

Thompson also contends that the questioning was coercive because the inspectors deceived Thompson about the evidence they had against him. In particular, the inspectors lied to Thompson by telling him that neighbors saw him near Bivins's house that afternoon, that they found his bloody fingerprint on a chair in the dining room, and that a neighbor saw him arguing with Bivins at her house on the day of the murder. Although deception is a factor weighing against a finding of voluntariness, "Numerous California decisions confirm that deception does not necessarily invalidate a confession." (citations omitted).  Instead, "the courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable."  (*People v. Jones*, (1998) 17 Cal. 4th 279, 297-298).  In *Jones*, a detective's suggestion "that he knew more than he did or could prove more than he could. . . . was permissible, for it was not 'of a type reasonably likely to procure an untrue statement.'"  The inspectors' deception in this case was also not of a type reasonably likely to procure an untrue statement.

10
11
12
13

. . .

Thompson contends that his "age and learning disability made him particularly susceptible to the inspectors' coercive tactics." Although we do take into consideration that Thompson was 18 years old at the time of the questioning and enrolled in special education classes because he had "trouble learning," the record does not reveal such youthfulness and low intelligence that Thompson would have been unusually vulnerable to the inspectors' tactics.

14
15
16
17
18
19
20
21

. . .

In light of the record in its entirety, including the circumstances described above, we conclude that there was no improper police coercion during the period of unwarned questioning and that Thompson's statements during that period were voluntary. Although Thompson waited at the police station for a long time before the questioning, the overall environment was relatively unintimidating and nonoppressive. (citations omitted).  Although the inspectors did not notify Thompson of his *Miranda* rights and utilized deception in obtaining Thompson's statements, the inspectors did not make promises or threats and the overall tenor of the questioning was not coercive. Although the trial court suppressed portions of the statements made during the period of the unwarned custodial interrogation as the product of a *Miranda* violation, none of the statements were involuntary.

22

 Ex. 6 at 8-12. [citations and footnotes omitted]

23
24
25
26
27
28

Again keeping in mind the highly deferential standard of the AEDPA, this Court concludes that Petitioner's initial statements were not rendered involuntary as a result of coercive police tactics.  Viewing the record as a whole, nothing suggests that Petitioner's statements to the inspectors involved physical or psychological coercion.  See Blackburn v. Alabama, 361 U.S. 199, 207 (1960); Schneckloth v. Bustamonte, 412 U.S. 218, 226-27 (1973).

Based on the totality of the circumstances, Petitioner cannot reasonably claim that having been given an option of continuing the conversation at a later date, and nonetheless having consented to go to the police station and having agreed to talk to the inspectors, that those circumstances amounted to police coercion. Even after the custodial interrogation began, the police still appealed to Petitioner's sense of honesty without resorting to any threats. The state court's rejection of Petitioner's claims was not contrary to, or an unreasonable application of clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254 (d)(1)(2).

3.   Voluntariness of Miranda Waiver

Having concluded that Petitioner's pre-Miranda statements were not involuntary, the Court must consider whether Petitioner's subsequent Miranda waiver and statements were voluntary, without presuming taint from the preceding period of pre-Miranda interrogation. Petitioner argues that the appellate court's reasoning, based upon the totality of the circumstances, was contrary to clearly established law. Pet. at 18. Petitioner also relies on People v. Honeycutt, 20 Cal. 3d 150 (1977), which the appellate court distinguished in its discussion of the voluntariness of Petitioner's Miranda waiver.

As to the voluntariness prong, the appellate court held that Petitioner's Miranda waiver was freely made and uncoerced.

It is undisputed that the inspectors eventually properly informed Thompson of his *Miranda* rights and that Thompson waived those rights and continued to make statements to the inspectors. Thompson contends, however, that his waiver was involuntary because he waived his rights only after the inspectors "softened him up," citing *People v. Honeycutt* (1977) 20 Cal.3d 150. In *Honeycutt*, the defendant at first was hostile and unwilling to discuss the case, but eventually waived his rights and confessed after an officer, whom the defendant knew, engaged the defendant in a half-hour discussion, during which the detective discussed "unrelated past events and former acquaintances and, finally, the victim," who the officer indicated had been a suspect in a homicide case. (*Id.* at p. 158.) The Supreme Court concluded that "when the [*Miranda*] waiver results

from a clever softening-up of a defendant through disparagement of the victim and ingratiating conversation, the subsequent decision to waive without a *Miranda* warning must be deemed to be involuntary . . . ." (*Id.* at p. 160.)

As this district has previously recognized, "*Honeycutt* involves a unique factual situation and hence its holding must be read in the particular factual context in which it arose." (*People v. Patterson* (1979) 88 Cal. App. 3d 742, 751.)  Like *Patterson*, this case is distinguishable from *Honeycutt*.  Neither inspector was an acquaintance of Thompson; Thompson never showed hostility toward the inspectors; and the inspectors did not engage Thompson in discussion regarding unrelated matters. The inspectors did express sympathy toward Thompson and suggest that the killing might have been in self-defense, but there is no indication that these comments overbore Thompson's will and rendered his *Miranda* waiver involuntary. (See *People v. Gurule* (2002) 28 Cal.4th 557, 603 [no evidence that officer's small talk overbore defendant's free will].)

Thompson also contends that his age and learning disability, in addition to the general circumstances of the interrogation discussed above, rendered his waiver involuntary. Waiver is "'a matter which depends in each case "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."'" (*People v. Bradford*, *supra*, 14 Cal.4th at p. 1034, quoting *Edwards*, *supra*, 451 U.S. at p. 482.) Although young, Thompson was not a minor in June 1998, and the fact that he may have a learning disability does not indicate that he was unable to understand his rights. As the trial court concluded, the videotape shows that Inspector Conaty properly informed Thompson of the Miranda rights and that Thompson indicated that he understood those rights with a nod of his head. The videotape indicates that the inspectors were careful, polite, and soft-spoken, not overbearing. Nothing on the videotape indicates that Thompson did not understand his rights or was reluctant to speak to the inspectors.

Taking into consideration the totality of the circumstances, including the preceding period of non-*Mirandized* interrogation, we conclude the People met their burden of showing by the preponderance of the evidence that Thompson knowingly, intelligently, and voluntarily waived his Miranda rights during the police interrogation in the early morning hours of June 23. The trial court did not err in admitting Thompson's statements after he was informed of his *Miranda* rights. (See *United States v. Orso*, *supra*, 266 F.3d at 1040 [*Mirandized* confession admissible despite temporal proximity to unwarned but noncoercive interrogation].)

Ex. 6 at 13-14 (internal citations and footnotes omitted).

Here, the underlying record supports the appellate court's conclusion that Petitioner made

a valid waiver of his <u>Miranda</u> rights.  Petitioner clearly was familiar with his <u>Miranda</u> rights, and

he was able to recite them to Inspector Conaty.  Ex. 9 at 84-85.[2]  In addition, Inspector Conaty

made Petitioner aware that he had a right to an attorney before and during questioning and that

anything that was said would be put in a police report and could be used in court later.  Ex. 9 at

85-86.

The evidence at the suppression hearing also supports the appellate court's finding that

there was sufficient evidence for the trial court to reject Petitioner's claim.  The trial court

watched the videotape of Petitioner's questioning by the inspectors.  The court observed that

Petitioner was looking Inspector Conaty in the eye during the <u>Miranda</u> advisements and was

nodding his head that he understood correctly.  Ex. 2 at 468.  The trial court also noted that

Petitioner did not decline to speak and was already aware that he was in custody, that the

inspectors intended to speak with the district attorney in the morning, and that he would be in jail

for the night.  Ex. 2 at 468-469, Ex. 9 at 80.  The appellate court's determination that the

inspectors' statements urging Petitioner to tell the truth and take responsibility did not render

---

   [2] Inspector:  Here's the important thing, though.  You know your rights.  You've heard them
before?
        Petitioner:  Yeah
        Inspector:  Can you tell me to me so I know that you know them?  How about if I help you
start?
        Petitioner:  You are under arrest.
        Inspector:  You have the right to remain –
        Petitioner:  Yeah, you have the right to remain silent.  Anything you say will be held
against you in a court of law.
        Inspector:  You have the right to the presence –
        Petitioner:  You have the right to the presence and an attorney?
        Inspector:  Of an attorney.
        Petitioner:  Of an attorney.
        Inspector:  before and during questioning.  And if you can't afford an attorney, we'll get
you one at no cost.
        Petitioner:  All right.
        Inspector:  Okay?  Pretty clear?  Let's just go over.  I want to tell it to you. [Miranda read]

Petitioner's <u>Miranda</u> waiver and subsequent statements involuntary thus was neither contrary to or an unreasonable application of federal law.

Relying upon <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004), Petitioner claims that his post-Miranda statement must be excluded as "fruit of the poisonous tree." Pet. at 8. However, the "fruit of the poisonous tree" doctrine does not operate in the <u>Miranda</u> context in the same way that it does in the Fourth Amendment context. <u>United States v. Patane</u>, 542 U.S. 630, 636 (2004) (plurality opinion) ("fruit of the poisonous tree" doctrine does not apply to <u>Miranda</u> violations); <u>id.</u> at 645 (Kennedy and O'Connor, JJ, concurring in the judgment) (admission of non-testimonial physical evidence does not run risk of admission of coerced incriminating statements; in light of evidentiary value of physical evidence, "doubtful" that exclusion could be justified by deterrence rationale); <u>Missouri v. Seibert</u>, 542 U.S. 600, 611-14 (2004) (plurality opinion) (issue in "question first, warn later" procedure, in which police obtain confession without giving <u>Miranda</u> warning, then give warning and obtain confirmation, is whether <u>Miranda</u> warning could function effectively; if warning could not place suspect in position to make informed choice, such mid-stream warnings cannot be accepted as compliant with <u>Miranda</u>);[3] <u>id.</u> at 620-22 (Kennedy, J., concurring in the judgment) (if police deliberately use the two-step strategy, post-warning statement must be excluded unless curative steps are taken, which would include substantial break in time and circumstances between statements or additional warning that first statement likely inadmissible); <u>Oregon v. Elstad</u>, 470 U.S. 298, 306 (1985).

In <u>Elstad</u>, the Supreme Court found that absent "actual coercion," the taint of

---

[3]The "two-step interrogation strategy, termed 'question-first' . . . called for the deliberate withholding of the <u>Miranda</u> warning until the suspect confessed, followed by a <u>Miranda</u> warning and a repetition of the confession already given." <u>United States v. Williams</u>, 435 F.3d 1148, 1154 (9th Cir. 2006) (citing <u>Seibert</u>, 542 U.S. at 604, 609-11) (plurality opinion)).

1  statements "technically in violation of <u>Miranda</u>" may be purged by a subsequent, voluntary

2  <u>Miranda</u> waiver.  <u>Oregon v. Elstad</u>, 470 U.S. at 309, 318.  "When a prior statement is actually

3  coerced, the time that passes between confessions, the change in place of interrogations, and the

4  change in identity of the interrogator all bear on whether that coercion has been carried over into

5  the second confession."  <u>Id.</u> at 310.  In <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004), the Supreme

6  Court revisited the issue of "midstream" <u>Miranda</u> warnings in cases of sequential confessions.  In

7  <u>Seibert</u>, a four-judge plurality found that whether a confession taken after an initial <u>Miranda</u>

8  violation would render a second confession inadmissible should be considered under a multi-

9  factor test, examining: 1) the completeness and detail of the questions and answers in the first

10  round of interrogation, 2) the overlapping content of the two statements, 3) the timing and setting

11  of the first and the second confession, 4) the continuity of police personnel, and 5) the degree to

12  which the interrogator's questions treated the second round as continuous with the first.  <u>Id.</u> at

13  615 (plurality opinion).  Although the <u>Seibert</u> plurality did not explain which criterion in its

14  multi-factor test should weigh most heavily, it noted that the two ultimate questions are, "Could

15  the warnings effectively advise the suspect that he had a real choice about giving an admissible

16  statement at that juncture?  Could they reasonably convey that he could choose to stop talking

17  even if he had talked earlier?"  <u>Id.</u> at 611–612.

18      When a suspect makes an incriminating statement before being advised of his <u>Miranda</u>

19  rights and makes another incriminating statement after being advised of his <u>Miranda</u> rights, the

20  second statement need not be suppressed in every case.  "Though <u>Miranda</u> requires that the

21  unwarned admission must be suppressed, the admissibility of any subsequent statement should

22  turn . . . solely on whether it is knowingly and voluntarily made."  <u>Elstad</u>, 470 U.S. at 309; <u>see</u>

23  <u>United States v. Williams</u>, 435 F.3d 1148, 1157 (9th Cir. 2006) (holding that "a trial court must

suppress postwarning confessions obtained during a deliberate two-step interrogation where the midstream <u>Miranda</u> warning -- in light of the objective facts and circumstances -- did not effectively apprise the suspect of his rights"); <u>cf.</u> <u>Seibert</u>, 542 U.S. at 613-16 (plurality opinion) (distinguishing <u>Elstad</u> as a situation where <u>Miranda</u> warnings could have been effective because of passage of time and change of location between unwarned questioning at suspect's home and later warned questioning at station house); <u>id.</u> at 613-14 (Kennedy, J., concurring in the judgment) (if police deliberately use the two-step strategy, post-warning statement must be excluded unless curative steps are taken); <u>Williams</u>, 435 F.3d at 1157-58 ("where law enforcement officers <u>deliberately</u> employ a two-step interrogation to obtain a confession and where separations of time and circumstance and additional curative warnings are absent or fail to apprise a <u>reasonable person</u> in the suspect's shoes of his rights, the trial court should suppress the confession") (emphasis in original).  In the <u>Elstad</u> situation, only if the unwarned admission was involuntary due to unconstitutional coercion could the warned statement be suppressed as "tainted fruit." <u>Elstad</u>, 470 U.S. at 310.

In <u>Williams</u>, the Ninth Circuit articulated how a court should determine whether an interrogator used a deliberate two-step strategy: "[t]he court should consider any objective evidence or available expressions of subjective intent suggesting that the officer acted deliberately to undermine and obscure the warning's meaning and effect." <u>Williams</u>, 435 F.3d at 1160.  Deliberateness may be shown by subjective evidence, e.g., the officer's testimony, and objective evidence, such as "'the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre-and postwarning statements.'" <u>United States v. Narvaez-Gomez</u>, 489 F.3d 970, 974 (9th Cir. 2007) (quoting <u>Williams</u>, 435 F.3d at 1159).

1

2          "When an interrogator has deliberately employed the two-step strategy, <u>Seibert</u> requires

3    the court then to evaluate the effectiveness of the midstream Miranda warning to determine

4    whether the postwarning statement is admissible."  <u>Williams</u>, 435 F.3d at 1160 (citing <u>Seibert</u>,

5    542 U.S. at 615 (plurality opinion)).  In determining effectiveness,

6          the court must address (1) the completeness and detail of the prewarning
             interrogation, (2) the overlapping content of the two rounds of interrogation, (3)
7            the timing and circumstances of both interrogations, (4) the continuity of police
             personnel, (5) the extent to which the interrogator's questions treated the second
8            round of interrogation as continuous with the first and (6) whether any curative
             measures were taken.
9

10   <u>Id.</u> at 1203 (citing <u>Seibert</u>, 542 U.S. at 615 (plurality opinion)).  "On the other hand, where the

11   court finds deliberateness to be absent, '[t]he admissibility of postwarning statements should

12   continue to be governed by the principles of <u>Elstad</u>.'"  <u>Id.</u> at 1204 (citing <u>Seibert</u>, 542 U.S. at 622

13   (plurality opinion)).[4]

14

15          This Court notes that Petitioner does not cite to the record or present any evidence in

16   support of his assertion that the inspectors in this case deliberately withheld their <u>Miranda</u>

17   advisement until Petitioner had incriminated himself.  Moreover, unlike the defendant in <u>Seibert</u>,

18   Petitioner was not under arrest at the time of questioning by the inspectors.  There is no evidence

19   in the record concerning an official police policy of deliberately withholding <u>Miranda</u> warnings

20   until a suspect has confessed.  In contrast to the police officers in <u>Seibert</u>, the inspectors here did

21

22

23   ─────────────────────

24   [4]"<u>Seibert</u> diminishes <u>Elstad</u> but does not destroy it . . . [because] a majority of the Justices in
     <u>Seibert</u> would bar postwarning confessions elicited during deliberate and unremedied two-step
25   interrogations, even if they were given after voluntary unwarned statements."  <u>Williams</u>, 435
     F.3d at 1161.  The Ninth Circuit's holding in <u>Williams</u>, indicating that there are some "improper
26   tactics," short of coercion, that taint a two-step confession, abrogated <u>United States v. Orso</u>, 266
     F.3d 1030, 1034-35 (9th Cir. 2001) (en banc) (rejecting petitioner's contention that confession
27   was inadmissible because it was obtained by "improper tactics") because "a majority of the Court
     has held that in some category of cases involving voluntary prewarning statements, police
28   conduct may nonetheless render Miranda warnings ineffective."  <u>Id.</u>

not testify that they withheld <u>Miranda</u> warnings until after Petitioner confessed.  Under these circumstances, the state appellate court's analysis under <u>Elstad</u> was not an unreasonable application of the law.[5]

The state appellate court's conclusion that Petitioner's <u>Miranda</u> waiver and subsequent statements were voluntary was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254 (d)(1), (2).

4.  Fourth Amendment Claim

Petitioner's fourth claim, that his incriminating statements were inadmissible as the tainted fruit of an unlawful detention, is not cognizable under 28 U.S.C. § 2254.  <u>Stone v. Powell</u>, 428 U.S. 465, 481-82, 494 (1976), bars federal habeas review of Fourth Amendment claims unless the state did not provide an opportunity for full and fair litigation of those claims. Even if the state courts' determination of the Fourth Amendment issues was improper, it will not be remedied in federal habeas corpus actions as long as the Petitioner was provided a full and fair opportunity to litigate the issue.  <u>See</u>  <u>Locks v. Sumner</u>, 703 F.2d 403, 408 (9th Cir.), <u>cert. denied</u>, 464 U.S. 933 (1983).  All that is required by <u>Stone v. Powell</u> is the initial opportunity for a fair hearing.

Here, Petitioner was provided a full and fair opportunity to litigate the issue in state court.  Before trial, Petitioner filed a motion to suppress his statements pursuant to California

---

[5] Respondent points out that <u>Seibert</u> was decided after the state appellate court rejected Petitioner's claims on direct appeal.  Resp. Mem. at 45.  Petitioner did not raise the <u>Seibert</u> issue in state court, nor was the issue fairly presented to the state supreme court in his petition for review.  As such, Respondent contends that Petitioner's <u>Seibert</u> claim is unexhausted.  <u>See</u> 28 U.S.C. § 2254(b), (c)).  However, based upon its determination that <u>Seibert</u> is distinguishable from Petitioner's case, the Court addresses Petitioner's contention on the merits and need not reach the issue of exhaustion.  <u>Id.</u> at § 2254(b)(2).

Penal Code § 1538.5, alleging that he was seized without probable cause and that his statements were the fruit of that unlawful detention.  The trial court denied Petitioner's motion after conducting a hearing where numerous witnesses testified, including Petitioner, on both the <u>Miranda</u> claim and the illegal seizure claim.[6]  Ex. 2 at 386.  The state appellate court also reviewed Petitioner's claim, concluding that "[w]e need not decide whether the trial court properly denied the motion on that ground, because we conclude that [Petitioner's] stay in the police station break room was a consensual encounter rather than a seizure subject to the limitations of the Fourth Amendment. . . We conclude under the totality of the circumstances that [Petitioner] was not seized before he was questioned.  [Petitioner's] claim that his statements were the fruit of an illegal detention is without merit, and the trial court did not err in denying his motion to suppress on that ground."  Ex. 6 at 17, 18-19.  Such an opportunity for a fair hearing forecloses this Court's inquiry into the trial court's subsequent course of action, including whether or not the trial court made any express findings of fact.  <u>See</u> <u>Caldwell v. Cupp</u>, 781 F.2d 714, 715 (9th Cir. 1986).

## CONCLUSION

For the reasons set forth above, the Court concludes that Petitioner has failed to show any violation of his federal constitutional rights in the underlying state criminal proceedings.  Accordingly, the petition for writ of habeas corpus is denied.

///

///

///

---

[6] The trial court based its denial on the facts that Petitioner was on probation subject to a search condition and that state law dos not require a police officer to be aware of a search condition of a probationer or parolee in order for the search to be valid.

1   Petitioner's motions asserting ineffective assistance of counsel and for an evidentiary hearing

2   (docket nos. 41, 42) are DENIED. The Clerk shall enter judgment and close the file.

3       IT IS SO ORDERED.

4   DATED: __ 3/31/08 _____     _____

5                          JEREMY FOGEL
                        United States District Judge